UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
John Rhodes,                          :
                                      :
                    Plaintiff,        :        **MEMORANDUM & ORDER**
                                      :
        -against-                     :        05-CV-1589 (DLI)
                                      :        ___
Commissioner of Social Security,[1]   :
                                      :
                    Defendant.        :
----------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiff John Rhodes filed an application for disability insurance benefits and supplemental

security income payments under the Social Security Act (the "Act") on January 19, 1999. Plaintiff's

application was denied initially and on reconsideration. Plaintiff acting *pro se* testified at a hearing

held before an Administrative Law Judge ("ALJ") on January 25, 2000. By decision dated April 12,

2000, the ALJ concluded that plaintiff was not disabled within the meaning of the Act. Dissatisfied

with that decision, plaintiff, with the assistance of newly obtained counsel, requested review. On

December 13, 2002, the Appeals Council vacated the April 12, 2000 decision and remanded his

claims for further consideration and a new decision.

Plaintiff testified at a second hearing held before the ALJ on February 19, 2003. At the

ALJ's request, a board-certified psychiatrist also testified at the hearing as an impartial medical

expert. By decision dated March 24, 2003, the ALJ concluded that plaintiff was not under a

disability that commenced prior to December 31, 2000, the date his disability insured status expired,

_____

[1]Pursuant to Fed. R. Civ. P. 25(d), Michael J. Astrue shall be substituted for
Commissioner Jo Anne B. Barnhart as the defendant in this action.

1

and that he was not, therefore, eligible for disability insurance benefits. Concerning plaintiff's claim for supplemental security income payments, however, the ALJ concluded that plaintiff was disabled as of January 1, 2002. On January 18, 2005, the ALJ's decision on remand became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review.

Pursuant to Fed. R. Civ. P. 12(c), the Commissioner now moves for judgment on the pleadings, affirming his determination that plaintiff was disabled as of January 1, 2002, but not for any period prior thereto. Plaintiff cross-moves for judgment on the pleadings, seeking reversal of the Commissioner's decision, or alternatively, to remand. For the reasons set forth below, the Commissioner's decision is affirmed and plaintiff's motion is denied.

## I.    Summary of Facts

*Medical Evidence (Mental)*

1.    Prior to Alleged Onset Date

Plaintiff's documented treatment history for substance abuse and psychiatric problems dates to 1994, when he underwent a psychiatric evaluation at College Hill Medical Center ("College Hill"). (Admin. R. at 168-69.) In a report dated February 24, 1994, Dr. Harold Pascal wrote that plaintiff was delusional and had a cocaine habit. (*Id.*) Dr. Pascal diagnosed plaintiff with schizophrenia, paranoid-type, and substance abuse (cocaine). (*Id.* at 169.) He recommended that plaintiff take medication, but plaintiff refused treatment. (*Id.*)

2.    Alleged Onset Date to the Date Last Insured

On October 27, 1996, Dr. Luigi Marcuzzo evaluated plaintiff on a consultative basis. (*Id.* at 225-26.) Plaintiff presented without any clear psychiatric complaint and was not in psychiatric treatment at the time. (*Id.* at 225.) He told Dr. Marcuzzo that he had stopped using cocaine in 1995,

and had no history of alcohol use. (*Id*.) Plaintiff described his only medical problem as "foot pain." (*Id*.) On mental status examination, plaintiff was pleasant and cooperative, but detached and guarded, relating to Dr. Marcuzzo in a guarded and suspicious manner. (*Id*.) Dr. Marcuzzo noted that plaintiff had no clear-cut delusions or hallucinations, he was oriented, and his memory, recent and remote, was adequate. (*Id*.) Dr. Marcuzzo also noted, however, that plaintiff's attention and concentration were impaired, making him easily distractable, and his insight and judgment were impaired overall. (*Id*. at 225-226.) His sustained concentration, persistent social interaction and adaptation were also impaired. (*Id*. at 226.) Dr. Marcuzzo's diagnosis was: "Rule out psychosis, not otherwise specified. History of cocaine dependence, in apparent remission." (*Id*.) He noted that plaintiff may benefit from psychiatric treatment and attending Narcotics Anonymous meetings, and felt that plaintiff's prognosis was fair. (*Id*.)

On February 10, 1998, plaintiff presented at the Kings County Hospital Center ("KCHC") psychiatric emergency center. (*Id*. at 134-39.) Dr. Ashox Saha, plaintiff's examining psychiatrist, reported that plaintiff was calm, quiet and cooperative, and that he used to smoke crack cocaine and drink alcohol. (*Id*. at 134.) On mental status examination, plaintiff appeared his stated age and was casually dressed. (*Id*. at 136.) He made good eye contact, and his speech was clear, coherent and spontaneous. (*Id*.) Plaintiff had no formal thought disorder, and denied having any delusions, homicidal ideation, suicidal ideation, or perceptual disturbances. (*Id*.) His mood was normal to slightly anxious, and his affect was appropriate to his mood. (*Id*.) Plaintiff's level of consciousness was alert, his attention was fair, his concentration was good, and he was oriented. (*Id*. at 138.) His recent memory, remote memory, and recall and retention were all intact. (*Id*.) His intelligence was average, and his insight, judgment and abstraction were fair. (*Id*.) On diagnosis, Dr. Saha ruled out

organic mood disorder, and plaintiff was discharged with no recommended treatment. (*Id*. at 137-38.)

Plaintiff was next evaluated on December 7, 1998 by Dr. Eugene Allen, a psychiatrist. (*Id*. at 142-43.) Plaintiff asserted that he had no medical problems; rather, welfare had sent him for an examination. (*Id*. at 142.) Plaintiff reported that he had been an inpatient at Kings Park Hospital for three weeks in 1978, and that although he had used cocaine and marijuana from age fifteen to age thirty-six, he had been clean for four years. (*Id*.) Dr. Allen described plaintiff's rapport as good, but that he made limited eye contact. (*Id*.) Plaintiff's speech was clear, coherent and relevant. (*Id*.) He evidenced no perceptual distortions nor suicidal thinking, and his mood was normal. (*Id*.) His attention and concentration were adequate, his insight was good, and his memory was fair. (*Id*. at 143.) In Dr. Allen's opinion, plaintiff had a fair ability to understand, carry out and remember instructions, as well as a fair ability to respond appropriately to supervision, co-workers and work pressures in a work setting. (*Id*.) Dr. Allen's diagnostic impression revealed polysubstance abuse (marijuana and cocaine), in remission. (*Id*.) His prognosis was fair. (*Id*.)

Dr. Margaret Chu performed plaintiff's next psychiatric evaluation on February 8, 1999. (*Id*. at 151-53.) Plaintiff claimed that he was depressed, disappointed and discouraged because he could not find a job. (*Id*. at 151.) He related a history of substance abuse since the age of twenty-two, and that he started to drink around the age of thirty-five. (*Id*.) Plaintiff denied any auditory hallucinations, or suicidal or homicidal ideations. (*Id*.) Dr. Chu noted that plaintiff's medical history was negative for any impairment; he was healthy, well-developed, well-nourished and in no acute distress. (*Id*.) After performing a mental health examination, Dr. Chu reported that plaintiff's psychomotor activities were within normal limits, and that he was attentive, cooperative, and had

good eye contact, with an appropriate level of relatedness. (*Id*. at 152.) Plaintiff denied auditory or visual hallucinations. (*Id*.) His affect was appropriate, constricted, depressed and disappointed. (*Id*.) Although plaintiff felt hopeless and helpless at times, resulting in poor self-esteem, his impulse control and frustration tolerance were adequate and he was not suicidal or dangerous to others. (*Id*.) In Dr. Chu's opinion, plaintiff's ability to do work-related mental activity was as follows: "Understanding and memory, no significant limitation. Sustained concentration and persistence, social interaction and adaptation, no gross limitation." (*Id*.) Dr. Chu diagnosed plaintiff with alcohol, marijuana and cocaine abuse and dependence, in remission, and adjustment disorder with mixed features, depression and anxiety. (*Id*.) Dr. Chu opined that plaintiff might benefit from a substance abuse program consisting of relapse prevention. (*Id*. at 153.)

On February 8, 1999, Dr. Joseph Minola, a state agency consultative examiner, completed a psychiatric review technique form. (*Id*. at 178-86.) Dr. Minola found that plaintiff had a substance abuse disorder, and evaluated plaintiff under Section 12.09. (*Id*. at 178.) In a mental residual functional capacity assessment dated March 8, 1999, Dr. Minola reported that plaintiff was not significantly limited in his abilities to understand, remember and carry out very short and simple instructions, and make simple work-related decisions. (*Id*. at 187.) Plaintiff also did not have significant limitations in his ability to ask simple questions or request assistance. (*Id*. at 188.) However, Dr. Minola found plaintiff to be moderately limited in his abilities to remember locations and work-like procedures, understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by

them, and complete a normal workday without interruptions. (*Id*. at 187-88.) With respect to social interaction, plaintiff was also moderately limited in his abilities to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (*Id*. at 188.) Finally, plaintiff was moderately limited in his abilities to respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. (*Id*.) Dr. Minola assessed polysubstance dependence, presently in remission, and also ruled out substance-induced mood disorder, adjustment disorder with mixed features, depression and anxiety. (*Id*. at 189.) Dr. Minola's assessment was later affirmed by Dr. Dinoff. (*Id*.)

A questionnaire completed by Dr. B. Bukholtz at St. Mark's Institute for Mental Health ("St. Mark's"), bearing the notation "April 18, 2000" hand-written across the top, indicates that plaintiff was first seen at the facility on April 13, 2000. (*Id*. at 221-24.) Plaintiff testified that he presented at St. Mark's because he had been experiencing blackouts from severe alcohol consumption since early 2000. (*Id*. at 203.) Plaintiff's diagnoses were schizophrenia-residual type, with cocaine dependence in remission; alcohol abuse was ruled out. (*Id*. at 221.) Plaintiff's mood was labile and his affect was flat. (*Id*.) His perception was intact but his judgment was impaired. (*Id*.) The person who completed the form stated that plaintiff was chronically mentally ill, and due to mental conditions and drug use, was unable to follow a work routine. (*Id*. at 222-23.) Specifically, plaintiff was limited in his ability to do the following activities: remember locations and work-like procedures; understand and remember detailed instructions; carry out instructions; perform activities

within a schedule, maintain regular attendance and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (*Id*. at 224.) Moreover, plaintiff was unable to maintain attention and concentration for extended periods, make work-related decisions, and perform at a consistent pace without an unreasonable number and length of rest periods. Plaintiff was, however, able to travel in unfamiliar places and use public transportation. (*Id*.) Plaintiff was to be treated with weekly psychotherapy and monthly psychiatric visits. (*Id*. at 221.)

3.     <u>After The Date Last Insured</u>

By letter dated July 24, 2002, B. Jackowska, M.S. at St. Mark's reported that plaintiff had been attending the clinic since April 18, 2000. (*Id*. at 228.) His treatment consisted of three sessions per week, including one individual and two group sessions, covering psycho-educational aspects, relapse prevention and anger management, as well as a visit with a psychiatrist once a month. (*Id*.) Plaintiff's medications included Trazadone and Paxil. (*Id*.) Ms. Jackowska also reported that plaintiff continued to have difficulties interacting with others, very low energy and motivation, problems with concentration, remembering and carrying on directions, and showed mistrust to authority figures. (*Id*.) Hence, Ms. Jackowska concluded that plaintiff was not able to work at that time. (*Id*.) Plaintiff's diagnoses included: "Axis I: Major Depressive Disorder with Psychotic Features. [Rule out] Organic Mental Disorder, [and] Polysubstance Dep[endence] in Remission. Axis II: Personality Disorder under socialized. Axis III: Obesity. Axis IV: Poverty. Social Isolation. Axis V: 51-60." (*Id*.) Ms. Jackowska wrote a letter to the Social Security Administration on

February 18, 2003 indicating much of the same. (*Id*. at 233.) However, she also noted that plaintiff had been sober for over six months and was continuing treatment with Dr. B. Bukholtz. (*Id*.)

*Medical Evidence (Physical)*

On February 8, 1999, Dr. Antonio De Leon performed a consultative physical examination of plaintiff. (*Id*. at 154-56.) The review of plaintiff's systems was unremarkable, except that plaintiff was slightly obese and weighed 294 pounds. (*Id*. at 155.) On muscoskeletal examination, plaintiff was able to bend forward forty degrees and mount the examination table with no difficulty. (*Id*.) He was able to tandem walk, walk on both heel and balls of feet, but had difficulty squatting. (*Id*.) An examination of his neck, shoulder, elbow and wrist joint were negative, and his grip on the scale of 5 was 5/5. (*Id*.) However, plaintiff's fingers were swollen. (*Id*.) Plaintiff was also able to do both fine and gross manipulations, and there was no back tenderness or muscle spasm. (*Id*.) Plaintiff's hips, knees, and ankles were negative, and his straight leg testing was forty degrees bilaterally. (*Id*.)

On neurological examination, plaintiff was coherent, and oriented as to the time and place. (*Id*.) His memory was good, and his gait was normal. (*Id*.) There was no involuntary movement. (*Id*.) Plaintiff's cranial nerves were intact, and his reflexes were equal. (*Id*.) There were no pathological reflexes, nor evidence of motor, sensory or cerebellar dysfunction. (*Id*.) An EKG revealed regular sinus rhythm with Q wave, which disappeared partially with deep respiration, and plaintiff's pulmonary function test was within the normal limit. (*Id*. at 156.) Dr. De Leon's overall impression was history of drug use, history of depression, exogenous obesity and borderline hypertension. (*Id*.) Dr. De Leon opined that plaintiff was able to perform the following work-related activities: sitting - no limitation; walking, standing - mildly limited because of tiredness;

carrying and lifting - mildly limited because of tiredness.  (*Id*.)

On March 8, 1999, Dr. Minola indicated that plaintiff could lift up to twenty pounds occasionally, ten pounds frequently, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push and/or pull without limitation.  (*Id*. at 171.)  He had no postural, manipulative, visual or other limitation.  (*Id*. at 172-74.)

In or about December 1999, Dr. Dollinger completed a physician's assessment form, which indicates that plaintiff had right leg pain with a healing statis ulcer, and a psychiatric disorder by history.  (*Id*. at 229-30.)  Plaintiff complained that the right leg pain was brought on by standing for long periods and walking long distances.  (*Id*. at 232.)  As such, Dr. Dollinger suggested that plaintiff should be "limited to sedentary work" while the stasis ulcer healed.  (*Id*. at 230.)  However, Dr. Dollinger's assessment revealed that plaintiff could lift up to ten pounds, stand or walk for up to two hours, and sit for up to six hours.  (*Id*. at 229.)  Plaintiff was therefore employable so long as he limited activities requiring squatting.  (*Id*.)

*Plaintiff's Benefits Application and Testimony*

Plaintiff was born on July 1, 1958, and has a tenth grade education.  (*Id*. at 119, 270, 276.)  From November 1985 to June 1994, plaintiff worked as a track worker for the New York City Transit Authority, where he replaced rails and ties with other pieces on the train tracks.  (*Id*. at 272, 304-05.)  Plaintiff was demoted due to drug use in June 1994, and was ultimately fired in February 1995.  (*Id*. at 273.)  However, from May 1994 to February 1995, plaintiff worked as a car cleaner.  (*Id*. at 273, 305.)

At the hearing on January 25, 2000, plaintiff testified that he had two or three friends with whom he got along, and, although he had not spoken with his family for quite some time, he had a

good relationship with them. (*Id*. at 288-89.) Plaintiff denied hearing voices or thinking people were out to hurt him. (*Id*. at 289.) Moreover, he did not consider himself to be overly anxious, worried or depressed. (*Id*. at 291.) At the second hearing on February 19, 2003, however, plaintiff testified that he had become depressed about one year to one and one-half years earlier, in 2002. (*Id*. at 312.) He had stopped drinking about one year prior to the second hearing, but 2002 was plagued with restless nights for plaintiff, resulting in sleepiness and fatigue. (*Id*. at 309, 313-14, 317-18.) Plaintiff testified that he no longer wanted to do anything, and enjoyed very little. (*Id*. at 315.) He had no hobbies other than watching television, and claimed that he had never really had any friends. (*Id*. at 315-16.) He rarely socialized, and had minimal contact with his family. (*Id*. at 316.)

In 1994, plaintiff underwent a ninety-day inpatient detoxification treatment for his cocaine addiction at College Hill. (*Id*. at 274, 300.) Although plaintiff has not used cocaine since receiving treatment at College Hill, he drinks alcohol occasionally, mostly beer. (*Id*. at 281-83.) Regarding plaintiff's physical ailments, plaintiff testified at the first hearing that his right ankle had been bothering him for about four or five years after attempting to climb over a fence. (*Id*. at 284.) Plaintiff went to Metropolitan Hospital immediately following the accident, where an Ace Bandage was applied to his ankle; however, he never sought any additional treatment. (*Id*. at 285.) Although plaintiff claimed that his ankle swells up after he stands on it for four or five hours, he denied having any trouble walking. (*Id*. at 285-86.) At the second hearing, plaintiff testified that he could stand for about one-half hour to one hour before his ankle swelled, but that he could walk comfortably for about a mile, and, with breaks in between, maybe two miles. (*Id*. at 319-20.) Notably, plaintiff walked approximately eight blocks, and traveled alone by train to the first hearing. (*Id*. at 294.) He could carry about ten to twenty pounds, and could lift or carry between twenty and thirty pounds.

(*Id*. at 286-87.)

*Expert Medical Testimony*

At the second hearing, the ALJ also heard testimony from a board-certified psychiatrist, Dr. Harvey Bluestone. (*Id*. at 322-42.) Dr. Bluestone opined that schizophrenia had not been established in plaintiff's medical record because, although plaintiff had been diagnosed with psychoses, he had never been treated for schizophrenia or a psychotic condition. (*Id*. at 328, 340.) Moreover, whenever doctors had noted psychotic features in plaintiff's medical reports, it had always been at a time when plaintiff was taking drugs. (*Id*. at 339.)

Instead, Dr. Bluestone found plaintiff's symptoms to be consistent with depression. (*Id*. at 327-28.) With respect to Dr. Pascal's findings of delusions in 1994, Dr. Bluestone testified that it is extremely difficult to make a schizophrenia diagnosis for someone who was actively abusing alcohol and cocaine. (*Id*. at 324-25.) Regarding the evidence from St. Mark's, Dr. Bluestone also noted that although plaintiff was initially diagnosed with schizophrenia, the diagnosis was later changed to depression. (*Id*. at 326-27, 338-39.) Moreover, the treatment plaintiff received at St. Mark's was consistent with a diagnosis of depression because he was prescribed two anti-depressant medications, namely Trazadone and Paxil. (*Id*. at 327-28.) He was never prescribed any anti-psychotic medication. (*Id*.) Dr. Bluestone further noted that evidence of depression could be found in plaintiff's lack of interest and friends, as well as his appetite disturbance and inability to sleep. (*Id*. at 331.) However, plaintiff exhibited no thought disorder. (*Id*. at 332.) Regarding plaintiff's global assessment of functioning ("GAF") rating, Dr. Bluestone testified that a GAF rating of 51-60 was essentially meaningless because it is a "borderline range," and "may or may not" be compatible with some level of work." (*Id*.) Finally, Dr. Bluestone testified that, assuming plaintiff was

abstinent since January 2002, his depression met or equaled Section 12.04 of the Listing of Impairments. (*Id*. at 342.) Prior to that date, however, a sufficient period of time did not exist when plaintiff did not abuse alcohol for Dr. Bluestone to render an opinion. (*Id*.)

*The ALJ's Decision*

In a written decision dated April 12, 2000, the ALJ concluded that plaintiff was not disabled within the meaning of the Act and, therefore, was not entitled to either disability insurance benefits or supplemental security income payments. The ALJ utilized the five-step sequential analysis set forth in 20 C.F.R. §§ 404.1520 and 416.920 to reach his conclusion. The ALJ resolved step one in plaintiff's favor because he had not performed substantial gainful activity since the alleged onset date. At step two, the ALJ found that plaintiff suffered from one or more "severe" impairments, as defined by the Act. However, the ALJ resolved step three against plaintiff, finding that plaintiff's impairments, either alone or in combination, were not sufficiently "severe" to meet or equal an impairment listed in Appendix 1. The ALJ next analyzed plaintiff's "residual functional capacity." Under step four, the ALJ concluded that plaintiff was unable to perform past relevant work as a cleaner and transit worker/track repairer. However, the ALJ found that plaintiff retained the residual functional capacity to perform the full range of medium work, as set forth in 20 C.F.R. §§ 404.1567 and 416.967. The ALJ noted that the burden then shifted to the Social Security Administration to show that plaintiff could perform other work consistent with his age, education and work experience. At step five, the ALJ found that plaintiff, as a younger individual with limited education and unskilled past relevant work history, could perform the full range of medium work, making Medical-Vocational Rule 203.25 applicable. The ALJ noted that Medical-Vocational Rule 203.25 directed a finding of "not disabled," signifying that there were a significant number of jobs existing in the

economy that an individual such as plaintiff could perform.

Plaintiff appealed the ALJ's decision. By Notice dated December 13, 2002, the Appeals Council vacated the April 13, 2000 decision to consider additional medical evidence, as well as to call on the services of a vocational expert to properly adjudicate plaintiff's claim if warranted by the expanded record. On February 19, 2003, plaintiff and his newly-obtained counsel attended a supplemental hearing. The ALJ also heard testimony from Dr. Bluestone, a consultative psychiatrist.

On March 24, 2003, the ALJ issued a decision, finding plaintiff met the listing for major depression as of January 1, 2002, but not prior thereto. Specifically, the ALJ resolved step one in plaintiff's favor because he was not engaged in substantial gainful activity during the relevant period. At step two, the ALJ found plaintiff's impairments - exogenous obesity, polysubstance abuse, and a depressive disorder – were "severe" as defined by the Act. At step three, the ALJ found (1) that from April 5, 1995, plaintiff's alleged disability onset date, to December 31, 2001, it had not been documented or otherwise shown that plaintiff experienced manifestations of mental illness unrelated to substance abuse that were disabling, and (2) that since January 1, 2002, plaintiff had presented disabling manifestations of mental illness unrelated to substance abuse that met the level of severity contemplated in Appendix 1.

Under step four, the ALJ again concluded that plaintiff was unable to perform past relevant work as a cleaner and transit worker/track repairer, but, prior to January 1, 2002, plaintiff retained the residual functional capacity to perform the full range of medium work, as set forth in 20 C.F.R. §§ 404.1567 and 416.967. Finally, at step five, the ALJ found plaintiff's vocational factors and a maximum sustained work capability limited to medium work to direct a decision of not disabled for the period prior to January 1, 2002. Because plaintiff's insured status for disability insurance

benefits expired in December 2000,[2] he was eligible for supplemental security income payments only.

## II.      Discussion

### A.        Standard of Review

In reviewing the final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health and Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (citation and internal quotation marks omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript or the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate where "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the application and regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004) (collecting Second Circuit cases). Remand is also appropriate "where there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999)

---

[2]To be entitled to disability insurance benefits, a claimant must meet the insured status requirements of 42 U.S.C. § 423(c). Plaintiff met these requirements only through December 31, 2000. (Admin. R. at 101.)

(quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)).

**B.    Standards Governing Evaluation of Disability Claims By ALJ**

An individual is "disabled" under the Act where there is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof of showing disability by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5); *see also  See Carroll v. Sec'y of Health and Human Servs.,* 705 F.2d 638, 642 (2d Cir. 1983).

Pursuant to 20 C.F.R. §§ 404.1520 and 416.920, there is a five-step process by which the ALJ determines disability under the Act. If at any step the ALJ finds that the claimant is either disabled or not, the inquiry ends. At the first step, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. §§ 404.1520(b); 416.920(b). Second, the ALJ considers whether the claimant has a "severe impairment," without reference to age, education, or work experience. Impairments are "severe" when they significantly limit a claimant's physical or mental "ability to conduct basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c).

At the third step, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in Appendix 1.[3] 20 C.F.R. §§ 404.1520(d); 416.920(d). If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's "residual functional capacity" in steps four and five. 20 C.F.R. §§ 404.1520(e); 416.920(e). In the fourth step, the

---

[3]20 C.F.R. Pt. 404, Subpt. P, App. 1.

15

claimant is not disabled if he or she is able to perform "past relevant work." 20 C.F.R. §§ 404.1520(e); 416.920(f). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience; if so, the claimant is not disabled. 20 C.F.R. §§ 404.1520(f); 416.920(g). The burden of showing that the claimant could perform other work in this final step shifts to the Commissioner. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F.2d at 642).

### C.   Plaintiff's Alcoholism is Material to his Disability

Plaintiff first contends that the ALJ applied the incorrect legal standard in finding that it had not been documented or otherwise shown that plaintiff had experienced manifestations of mental illness unrelated to substance abuse that were disabling prior to January 2002. Specifically, plaintiff argues that the ALJ violated an order of the Commissioner in accepting Dr. Bluestone's testimony that a sufficient period of time did not exist prior to January 2002 when plaintiff did not abuse alcohol to render an opinion as to whether or not he was disabled and nevertheless, finding plaintiff to be not disabled prior to January 2002. *See Brueggman v. Barnhart,* 348 F.3d 689, 693 (8th Cir. 2003) ("If the ALJ is unable to determine whether substance use disorders are a contributing factor material to the claimant's otherwise-acknowledged disability, the claimant's burden has been met and an award of benefits must follow.") (citing Social Security Administration Emergency Teletype, No. EM-96-94 at Answer 29 (Aug. 30, 1996)). Plaintiff points to Emergency Teletype 96-200 ("Teletype") in support of his position. (Pl.'s Mem. Supp. J. Plead. 16-17) (citing Social Security Administration Emergency Teletype, No. EM-96-200 (Aug. 30, 1996)). The Teletype is an internal memorandum addressing questions and answers concerning DAA. The Teletype dictates that, when

it is not possible to "separate the mental restrictions and limitations imposed by DAA and the various other mental disorders shown by the evidence, a finding of 'not material' would be appropriate." Q&A 29. As such, plaintiff asserts, an order directing the Commissioner to find plaintiff disabled at least as of April 2000 is appropriate because uncertainty exists as to whether plaintiff would be considered disabled if he had been abstinent from April 2000 to January 2002. The court disagrees.

The Act establishes that "an individual shall not be considered to be disabled for purposes of this title [42 U.S.C. § 1381 *et seq.*] if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 1382c(A)(3)(J); *see also* 42 U.S.C. §§ 423(d)(2)(c) (same); 20 C.F.R. § 404.1535(a) (same); 20 C.F.R. §416.935(a) (same). The regulations require the an inquiry be made as to "whether [the Agency] would still find [a claimant] disabled if [the claimant] stopped using drugs or alcohol." 20 C.F.R. §§ 404.1535(b)(1); 416.935(b)(1). If the "remaining limitations," considered independently of any drug and alcohol abuse, would not be disabling, then drug addiction and/or alcoholism is a contributing factor material to the determination of disability and the claimant is not disabled. 20 C.F.R. §§ 404.1535(b)(2)(i); 416.935(b)(2)(i). If the claimant would be disabled regardless of the drug or alcohol use, then it is not a contributing factor. 20 C.F.R. §§ 404.1535(b)(2)(ii); 416.935(b)(2)(ii). The burden, however, is on the claimant to prove that substance abuse is not a contributing factor material to the disability determination. *Doughty v. Apfel,* 245 F.3d 1274, 1281 (2d Cir. 2001).

The court first notes that plaintiff points to no decision binding on this court that finds the Teletype to be binding as a matter of law. However, in the present case, the ALJ has not contradicted the Teletype because, contrary to plaintiff's assertions, the ALJ did not explicitly rely

on Dr. Bluestone's testimony that a sufficient period of time when plaintiff did not abuse alcohol did not exist prior to January 2002 to render an opinion as to whether or not he was disabled. Rather, the ALJ only made two references to Dr. Bluestone's testimony in the portion his March 24, 2003 decision relating to step three of the sequential analysis. First, the ALJ relied on Dr. Bluestone's testimony that it is difficult to diagnose an individual who is actively using drugs and alcohol with schizophrenia based on delusions and loose associations because such manifestations of mental illness are also consistent with active substance abuse in concluding that Dr. Pascal's 1994 diagnosis of schizophrenia was not an accurate reflection of plaintiff's mental functioning at the time. Second, the ALJ relied on Dr. Bluestone's testimony that plaintiff was not treated for a schizophrenic disorder at St. Mark's following Dr. Bukholtz's April 18, 2000 diagnosis of schizophrenia, and that St. Mark's subsequently changed its diagnosis to major depressive disorder and polysubstance abuse, in concluding that there was no medical basis for finding that plaintiff had a mental impairment that met or medically equaled the level of severity contemplated in Appendix 1 during the relevant period. Furthermore, with respect to Dr. Pascal's 1994 diagnosis, which, the court notes, precedes plaintiff's alleged onset date, the ALJ did not rely solely on Dr. Bluestone's testimony in reaching his conclusion that the 1994 diagnosis was inaccurate. Rather, the ALJ cited the absence of any subsequent diagnosis of schizophrenia until Dr. Bukholtz's April 2000 diagnosis and plaintiff's admission that cocaine abuse was the reason for his admission to College Hill in 1994.

In any event, no uncertainty exists with respect to whether plaintiff would be considered disabled had he been abstinent for a sufficient period of time prior to January 2002. For instance, when seen at KCHC on February 10, 1998 for a walk-in psychiatric evaluation plaintiff presented as a calm, quiet and cooperative individual who denied having any delusions, homicidal ideation,

suicidal ideation or perceptual disturbances. On diagnosis, Dr. Saha ruled out organic mood disorder, and plaintiff was discharged with no treatment recommended. Similarly, a mental status examination performed in December 1998 was essentially unremarkable and yielded no psychiatric diagnosis other than polysubstance abuse (marijuana and cocaine), in remission. During a psychiatric evaluation performed by Dr. Chu on February 8, 1999, plaintiff claimed that he was depressed and disappointed because he could not find a job; however, plaintiff again denied having any auditory hallucinations, or suicidal or homicidal ideations. Although Dr. Chu diagnosed plaintiff with alcohol, marijuana and cocaine abuse and dependence, in remission, and adjustment disorder with mixed features, depression and anxiety, objective psychiatric signs of a functionally limiting depressive disorder, as described in Appendix 1, were not appreciated by Dr. Chu. Likewise, in a psychiatric review technique form dated February 8, 1999, Dr. Minola found that plaintiff had polysubstance dependence, presently in remission, and ruled out substance-induced mood disorder, adjustment disorder with mixed features, depression and anxiety. Dr. Minola's assessment was later affirmed by Dr. Dinoff. Finally, the only diagnosis of schizophrenia plaintiff received between the time of his alleged onset date in 1995 and January 2002 was made by Dr. Bukholtz at St. Mark's in 2000. As stated above, however, the ALJ relied on Dr. Bluestone's testimony that plaintiff was not treated for a schizophrenic disorder and that St. Mark's subsequently changed his diagnosis to major depressive disorder and polysubstance abuse in finding the record to be devoid of evidence documenting that plaintiff had actually suffered from, or been treated for, schizophrenia, and it was not improper for him to do so. Therefore, Dr. Bukholz's initial diagnosis carries little weight when considering *all* of the evidence in the record regarding plaintiff's mental condition.

Plaintiff's own testimony further supports the ALJ's finding that plaintiff had not

experienced manifestations of mental illness unrelated to substance abuse that were disabling prior to January 2002. At the first hearing, on January 25, 2000, plaintiff testified that he did not consider himself to be overly anxious, worried or depressed, he denied hearing voices or thinking people were out to hurt him, and he indicated that he had a few friends with whom he got along. By contrast, at the second hearing held on February 19, 2003, plaintiff testified that he had become depressed only about one year to one and one-half years earlier, in 2002, and no longer wanted to do anything because he enjoyed very little. He further testified that he had no hobbies other than watching television, and rarely socialized.

Accordingly, the ALJ did not apply the incorrect legal standard and substantial evidence supports the ALJ's determination that plaintiff's substance abuse was a contributing factor material to the determination that plaintiff was not disabled prior to January 2002.

### D. The ALJ Properly Found that Plaintiff Retained the Ability to Perform the Full Range of Medium Work and Did Not Commit Legal Error in Applying The Medical-Vocational Guidelines

Plaintiff next contends that the ALJ's determination with respect to the his residual functional capacity in steps four and five of the sequential analysis was tainted by legal error and not supported by substantial evidence.

First, plaintiff argues that the ALJ failed to give proper weight to the opinions of non-examining physicians Dr. Minola and Dr. Dinoff in finding that plaintiff retained the ability to perform the full range of medium work.[4] Contrary to plaintiff's assertion, however, the Social Security Regulations provide that an examining physician's report is generally given more weight

---

[4] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c).

than a non-examining physician's report.  20 C.F.R. §§ 404.1527(d)(1); 416.927(d)(1).  Here, therefore, the ALJ properly attributed greater significance to a functional assessment provided by Dr. De Leon, a consultative examiner who, after examining plaintiff on February 8, 1999, found that he was able to sit without limitation and was only mildly limited in his ability to walk, stand, carry or lift, than to the opinions of Dr. Minola and Dr. Dinoff, both physicians from the State Agency who merely reviewed the evidence of record before reaching their conclusion that plaintiff was limited to performing the full range of light work.[5]  In any event, even assuming *arguendo* that plaintiff was limited to performing light work, given plaintiff's vocational characteristics as a younger individual with a limited education and unskilled past relevant work history, the medical-vocational guidelines would still direct a decision of not disabled for the period prior to January 1, 2002.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.17.

Second, plaintiff asserts that the ALJ committed legal error in applying the medical-vocational grids and failing to properly credit his non-exertional impairments.  Within the Second Circuit, the "application of the grid guidelines and the necessity for expert testimony must be determined on a case-by-case basis."  *Bapp v. Bowen,* 802 F.2d 601, 605 (2d Cir. 1986).  "[W]hen a claimant's nonexertional impairments significantly diminish his ability to work – over and above any incapacity caused solely from exertional limitations – so that he is unable to perform the full range of employment indicated by the medical vocational guidelines, then the Secretary must

---

[5]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing the full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).

introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." *Id*. at 603. To be "significantly diminished," the additional loss of work capacity must "so narrow[ ] a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id*. at 606. Use of the guidelines to determine disability is appropriate, however, if they adequately reflect a claimant's condition. *Id*. The "mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines." *Id*. at 603.

After considering of the entire record, including plaintiff's alleged non-exertional limitations, the ALJ concluded that plaintiff was not disabled for the period prior to January 1, 2002. The court finds substantial evidence to support the ALJ's determination based on the medical-vocational guidelines alone because plaintiff's ability to meet the basic mental demands of work was not significantly diminished by manifestations of mental illness, other than chronic substance abuse, prior to January 1, 2002.[6] Indeed, as the ALJ notes, no treating source or consultative examiner declared plaintiff to be disabled or reported significant nonexertional limitations unrelated to substance abuse prior to January 1, 2002. For instance, Dr. Allen concluded that plaintiff had a fair ability to understand, carry out and remember instructions, and to respond appropriately to supervision, co-workers and work pressures in a work setting, after performing a psychiatric evaluation of plaintiff on December 7, 1998. On February 8, 1999, Dr. Chu found plaintiff's ability to do work-related mental activity to be as follows: "Understanding and memory, no significant limitation. Sustained concentration and persistence, social interaction and adaptation, no gross

_____

[6]The basic mental demands of work include the abilities to understand, remember and carry out simple instructions, and to respond appropriately to supervision, coworkers, and work pressures in a work setting. 20 C.F.R. §§ 404.1545(c); 416.945(c).

limitation." (Admin. R. at 152.)

Similarly, in a mental residual functional capacity assessment dated March 8, 1999, Dr. Minola reported that plaintiff was not significantly limited in his abilities to understand and remember very short and simple instructions, carry out very short and simple instructions, make simple work-related decisions, and ask simple questions or request assistance. Although Dr. Minola went on to report that plaintiff was moderately limited in sixteen other areas of work-related mental functions in the assessment, plaintiff testified that he had only stopped drinking alcohol one year prior to the second hearing, in 2002. Indeed, plaintiff went to St. Mark's in April 2000 because he was experiencing blackouts from severe alcohol consumption. Moreover, with respect to the initial evaluation performed by Dr. Bukholtz at St. Mark's on April 18, 2000, Dr. Bluestone testified that any mental limitations plaintiff exhibited during the period of time he abused alcohol may have been caused or, at least exaggerated by, the alcohol. Finally, a plain reading of the record reveals that plaintiff was never under the care of any mental health professional or clinic during the period from April 1995 through April 2000, when he was initially evaluated at St. Mark's.

As testimony from a vocational expert is only necessary when the medical-vocational guidelines fail to describe accurately a claimant's particular limitations, the ALJ's exclusive reliance on the grids in making his determination in this case was not legal error.

**III.    Conclusion**

For the reasons set forth above, the decision of the Commissioner is affirmed.  Defendant's motion for judgment on the pleadings pursuant to Fed. R. Civ. P 12(c) is therefore granted. Plaintiff's motion is denied and the case is dismissed.

SO ORDERED.

DATED:        Brooklyn, New York
              August 31, 2007


                                        _____/s/_____
                                             DORA L. IRIZARRY
                                          United States District Judge